UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

CITY OF BOSSIER CITY          CIVIL ACTION NO. 11-0472

VERSUS                        JUDGE S. MAURICE HICKS, JR.

CAMP DRESSER & MCKEE INC.     MAGISTRATE JUDGE HORNSBY

**MEMORANDUM RULING**

Before the Court is a Motion for Partial Summary Judgment (Record Document 72) filed by the Plaintiff, the City of Bossier City ("the City"). The motion addresses the competing claims for damages arising from the contractual design obligation of the Defendant, CDM Smith Inc., formerly Camp Dresser & McKee, Inc. ("CDM"), to design a new Headworks Structure for the Red River Wastewater Treatment Plant ("RRWTP") pursuant to the terms of Amendment No. 1 to Agreement Between Owner and Engineer (Exhibit 14). CDM opposed the Motion for Partial Summary Judgment. See Record Document 79. After its review of the partial summary judgment record, the Court finds genuine disputes of material fact. The Motion for Partial Summary Judgment is, therefore, **DENIED**.

**BACKGROUND**[1]

From October 2008 to December 2011, Bryan Kauffer ("Kauffer") was employed by the City as Director of Public Utilities. In May 2009, Jacqueline Wesley ("Wesley") was an associate employed by CDM. During that time, Wesley was or had been the project leader

---

[1]The background section is drawn from the City's Statement of Material Facts as to Which There Exists No Genuine Issue to be Tried (Record Documents 72-1) and CDM's Statement of Contested Material Facts (Record Document 79-1). Many of the City's facts went uncontested. Citations to the record will be included for all contested facts.

for CDM on the project[2] which is the subject of the first Motion for Partial Summary Judgment. In May 2009, Justin Haydel ("Haydel") was employed by CDM and served as a vice-president of CDM.

On March 14, 2008, the City and CDM entered into an Agreement Between Owner And Engineer ("Wastewater Agreement"), which was executed by Mayor Lorenz Walker ("Mayor Walker") on behalf of the City and Haydel on behalf of CDM. See Record Document 72, Exh. 12 (Bates # CAMP 81634 - CAMP 81655). On June 23, 2009, the City and CDM entered into Amendment No. 1 To Agreement Between Owner And Engineer ("Amendment No. 1"), which was also executed by Mayor Walker and Haydel. See id., Exh. 14 (Bates # CAMP 00324 - CAMP 00329).

The provisions of the Wastewater Agreement are applicable to Amendment No. 1. The Wastewater Agreement provided:

> This Agreement (consisting of Pages 1 to 10 inclusive), and the Exhibits identified above constitute the entire agreement between OWNER and ENGINEER and supercede all prior written or oral understandings. This Agreement may only be amended, supplemented, modified, or canceled by a duly executed written instrument.

Id., Exh. 12 (Bates # CAMP 81642). Amendment No. 1 amends the Wastewater Agreement.

CDM prepared a Memorandum, dated April 2, 2009, entitled "Evaluation of Alternatives for Headworks Facilities, Red River Wastewater Treatment Plant, Bossier City, Louisiana" ("the April 2, 2009 Memorandum"). See id., Exh. 15 (Bates # CAMP 11038 -

---

[2]The project was to design a new Headworks Structure for the RRWTP.

CAMP 11061). CDM delivered the April 2, 2009 Memorandum to the City. Paragraph 1 of Amendment No. 1 states:

> ENGINEER shall provide professional engineering services for the design, bidding, general services during construction, resident inspection, surveying and geotechnical work associated with the construction of a new Headworks Structure for the Red River WWTP ***generally in accordance with the Memorandum Dated April 2, 2009 titled, "Evaluation of Alternatives for Headworks Facilities Red River Wastewater Treatment Plant, Bossier City, Louisiana."***

Id., Exh. 14 at 1 (Bates # CAMP 00324) (emphasis added).

The City contends that CDM recommended in the April 2, 2009 Memorandum that the new Headworks Structure for the RRWTP be designed by CDM with the following criteria:

> average daily flow capacity of 12.5 million gallons per day ("MGD"); peak flow capacity of 40 MGD; and estimated "Total Construction Cost" of $9,830,000.

Id., Exh. 15 at 1, 2, 7, 9 (Bates # CAMP 11038, 11039, 11044, 11046). Conversely, CDM contends that Amendment No. 1 contains the phrase "generally in accordance with the Memorandum Dated April 2, 2009" and that the memorandum made several proposals. See Record Document 79-1 at ¶¶ 11-13.

As to payment for CDM's design services, Amendment No. 1 provided:

> 4. The payment for services rendered by ENGINEER shall be as set forth below:
>
> The Fee for Basic engineering services during construction shall be determined from Fee Curve A from the ASCE MOP 45, 1981 Edition with a 1.1 multiplier and shall be a lump sum. Total fees for the project are as follows:
>
> > Basic Engineering Services - $9,800,000*(6%)*1.1=$646,800
> >
> > Surveying - $45,000 (paid as cost to OWNER)

        Geotechnical - $50,000

        Resident Inspection - $90,000 paid at $60/hour.

Record Document 72, Exh. 14 at 2 (Bates # CAMP 00325). The total amount to be paid to CDM for services rendered was approximately $831,800.

In September 2009, CDM submitted a 201 Facility Plan to the City. See id., Exh. 124. In the 201 Facility Plan, CDM estimated that the construction program cost of the new Headworks Structure for the RRWTP which CDM actually designed for Bossier City (i.e., a new Headworks Structure for the RRWTP with an average daily flow capacity of 16 million MGD and a peak flow capacity of 96 MGD) was $22.5 million. See id., Exh. 124 (Bates # CBC 1303). CDM later submitted an invoice to the City, in which CDM represented that the estimated construction cost of the new Headworks Structure for the RRWTP which CDM designed for the City was $21.6 million. See id., Exh. 33.

In October 2009, CDM submitted drawings to the City regarding the new Headworks Structure for the RRWTP. See id., Exh. 36. Sheet No. P-7 of the October 2009 submission shows the design criteria for the drawings prepared by CDM for the new Headworks Structure for the RRWTP. See id., Exh. 36 at 3. The design criteria set forth on P-7 indicates that the Headworks Structure actually designed by CDM for Bossier City had the following criteria: average daily flow capacity of 16 MGD and peak flow capacity of 96 MGD. See id.

CDM does not contest facts relating to the October 2009 drawings, but instead contends that the City "directed CDM to modify the agreement and CDM produced design documents that complied with the modified design criteria." Record Document 79-1 at ¶

24, citing Exhs. 124, 131, 152, 155, 169, & 170. More specifically, CDM argues that "facts and evidence provided in [its] Opposition establish that [the City] experienced an emergency which severely damaged the Headworks in early May [2009], and [the City] directed CDM to change its design criteria, resulting in an increase in costs to [the City]." Id. at ¶ 11, citing Exhs. 155, 169, 157, 131, 152, & 170. Additionally, CDM maintains that "after receiving the 201 Facility Plan, which contained the changed design criteria and increased cost information, [the City] provided no complaint and proceeded to pay CDM's pay requests in the following months." Id. at ¶ 24, Exhs. 124, 155, 169, 157, 131, 152, & 170. CDM asserts that its summary judgment evidence "establishes that throughout the negotiation process and beyond, [the City] directed CDM to make numerous changes." Id. at ¶ 27, citing Exhs. 131, 152, 155, 169, & 170. CDM argues there was an oral agreement between Kauffer and Haydel to modify the terms of the written contracts at issue. See Record Document 79 at 2. More specifically, CDM contends that there was oral agreement to modify the criteria and cost of the project and such modifications were confirmed by the conduct of the parties. See id.

From August to December 2009, the City paid CDM approximately $592,681.10 for basic engineering services, surveying, geotechnical, and resident inspection. See Record Document 72, Exhs. 132, 133, 134, & 135. On October 30, 2010, CDM submitted Pay Request No. 5 in connection with its design work, requesting $277,909.40. See Record Document 72, Exh. 33. The City contends that by virtue of this invoice, CDM unilaterally increased its fee to the City from a "lump sum" of $831,800 to a "lump sum" of $1,217,477. See id., Exhs. 32 & 33.

In June 2010, the City declared CDM to be in breach and default of the Wastewater Agreement, as amended. See Record Document 31, ¶ 43. The City gave CDM thirty (30) days written notice of termination of the Wastewater Agreement, as amended. See id.

The City eventually retained a second engineering firm to design the new Headworks Structure for the Red River Wastewater Treatment Plant. That engineering firm recommended that the City construct, and it later designed for the City, a new Headworks Structure for the RRWTP with an average daily flow capacity of 12 MGD, with a peak flow capacity of 48 MGD. CDM contests these facts, further noting that the City hired Haydel, who had left CDM in December 2009 and opened his own engineering firm, to take over the Headworks project. See Record Document 79-1, Exh. 167.

## LAW AND ANALYSIS

**I.     Partial Summary Judgment Standard.**

Rule 56(a) provides, in pertinent part:

> Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

F.R.C.P. 56(a) (emphasis added); see also Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir.2010).[3]  "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Quality Infusion Care, Inc., 628 F.3d at 728. "Rule 56[(a)] mandates the entry of summary

---

[3]The Court notes that amended Rule 56 requires that there be "no genuine dispute as to any material fact," but this change does not alter the Court's analysis. F.R.C.P. 56(a) and Advisory Committee Notes.

judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir.2004).

If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir.2004). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir.2005).

"A partial summary judgment order is not a final judgment but is merely a pre-trial adjudication that certain issues are established for trial of the case." Streber v. Hunter, 221 F.3d 701, 737 (5th Cir.2000). Partial summary judgment serves the purpose of rooting out, narrowing, and focusing the issues for trial. See Calpetco 1981 v. Marshall Exploration, Inc., 989 F.2d 1408, 1415 (5th Cir.1993).

II. **Louisiana Substantive Law on Modification of a Written Contract by Oral Amendment or Conduct of the Parties.**

At the summary judgment stage, "the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A key issue in this case is whether the written contracts at issue were modified orally or by the conduct of the parties.

When applying Louisiana substantive law, the Fifth Circuit has held that "it is well established that even if the written contract contains a provision requiring that all modifications be in writing . . . , either oral agreement or conduct can nonetheless prove modification." Taita Chem. Co., Ltd. v. Westlake Styrene Corp., 246 F.3d 377, 387 (5th Cir. 2001) (citations omitted); see also La. C.C. Art. 1848 ("Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature.  Nevertheless, in the interest of justice, that evidence may be admitted to prove such circumstances as a vice of consent or to prove that the written act was modified by a subsequent and valid oral agreement.").  "Louisiana courts have applied these principles to various types of contracts, . . . and permitted the introduction of evidence in an attempt to prove a subsequent modification of the written agreement, even if the written agreement provided that all modifications must be in writing." King v. Univ. Healthcare System, L.C., No. 08-1060, 2009 WL 2222698, *2 (E.D. La. July 24, 2009) (citations omitted).  The King court further explained:

> It is a question of fact as to whether there were oral agreements that modified the written contract.  The party asserting the modification of the obligation must prove the facts or acts giving rise to the modification.  The question of whether evidence offered by the plaintiff corroborates his claim under an oral contract is a finding to be made by the trier of fact.

Id. (internal citations omitted).

**III.   Analysis.**

Contrary to the City's arguments, this Court finds that CDM has met its burden of demonstrating the existence of a genuine dispute of material fact regarding whether the cost and design criteria of the written contracts at issue in this case were modified orally and/or by the conduct of the parties.  The communications between Haydel and Kauffer are

crucial evidence in this case. In his deposition, Kauffer described himself as the City's "primary person, point of contact" for the design project. See Record Document 79, Exh. 151 at 25-26. He further agreed that he was the primary City official that would have dealt directly with Haydel. See id., Exh. 151 at 25. In her deposition, Wesley testified regarding changes to the design criteria allegedly requested by Kauffer on behalf of the City:

> Q: Was this a phased job?
>
> A: Not that way it's laid on the plans now. There's the email I'm referring to where we are directed by Justin [Haydel] to make it 16 [MGD]. I forwarded it to the team saying this is what he means. That was Justin [Haydel] and Brian [Kauffer] and lots of discussion.
>
> Q: Okay. This is May 26, 2009. It says please make changes that Brian [Kauffer] wants. . . .
>
> A: There's nothing written from him prior to this saying, hey, 16 MGD. That was all verbal discussion between him and other members of the project team.

Id., Exh. 131 at 246-247. Viewing this evidence in the light most favorable to CDM, the Court considers the issue of Kauffer's actual authority versus his apparent authority to be a question of fact to be determined by the jury.

While it is true that the email referenced by Wesley in her deposition predates Amendment No. 1, which is dated June 23, 2009, the Court notes other evidence post-dating Amendment No. 1. For example, CDM has submitted an email exchange from November 2009 discussing a public hearing scheduled for December 2009. The email reads, in pertinent part:

> When this public hearing is held on 12/1/09, you will need to have your Director of Utilities or DDM's Justin Haydel, make some presentation about the "Head Works" not working and why you are moving in a direction to secure funding from DEQ at .95% for the fix.

> Also explanation why cost is $21M . . . .

Id., Exh. 157 (Bates # CBC 48843). City Attorney Jimmy Hall then forwarded the email to Kauffer, stating: "Just a heads up on needing someone to lead this discussion." Id. Kauffer then forwarded the email to Haydel and asked Haydel to "attend this for us." Id. The total construction cost in the email, which was sent to and forwarded by various city officials, is clearly listed as $21 million, not $9.8 million. See id.

Additionally, the Court believes that much, if not all, of Haydel's testimony is more properly evaluated by the trier of fact at trial, not by the undersigned at the summary judgment stage. Due to the circumstances surrounding Haydel's resignation from CDM in 2009, his opening of a competing engineering firm, and his subsequent and ongoing business relationships with the City, this Court finds that his credibility, potential bias, economic interests, and the overall weight to be given to his testimony are all issues that should be determined by the jury, as communications between Kauffer and Haydel are key evidence in this case. See generally King, 2009 WL 2222698, *2 ("It is a question of fact as to whether there were oral agreements that modified the written contract."); Anderson, 477 U.S. at 255, 106 S. Ct. at 2513-2514 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. . . . Neither do we suggest . . . that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.").

The City argues that much of CDM's summary judgment evidence is not competent. This Court disagrees and finds that CDM has gone beyond the pleadings and designated

specific facts in the record showing that there is a genuine issue for trial. See Gen. Universal Sys., 379 F.3d at 141. Partial summary judgment is, therefore, **DENIED**.

## CONCLUSION

The Court finds genuine disputes of material fact as to whether the cost and design criteria of the written contracts at issue in this case were modified orally and/or by the conduct of the parties. Accordingly,

**IT IS ORDERED** that the Motion for Partial Summary Judgment (Record Document 72) filed by the City be and is hereby **DENIED**.

**THUS DONE AND SIGNED**, Shreveport, Louisiana, this 16th day of September, 2014.

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE