UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| CITY OF BOSSIER CITY | CIVIL ACTION NO. 11-0472 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| CAMP DRESSER & MCKEE INC. | MAGISTRATE JUDGE HORNSBY |

**MEMORANDUM RULING**

Before the Court is a Motion for Partial Summary Judgment (Record Document 75) filed by the Plaintiff, the City of Bossier City ("the City"). The motion addresses the competing claims for damages arising from the Agreement Between Owner And Engineer ("Wastewater Agreement"), pursuant to which Defendant, CDM Smith Inc., formerly Camp Dresser & McKee, Inc. ("CDM"), was contractually obligated to prepare for Bossier City a Wastewater Master Plan (also referred to as a "201 Facility Plan"). See id. CDM opposed the Motion for Partial Summary Judgment. See Record Document 90. After its review of the partial summary judgment record, the Court finds genuine disputes of material fact. The Motion for Partial Summary Judgment is, therefore, **DENIED**.

**BACKGROUND**[1]

From October 2008 to December 2011, Bryan Kauffer ("Kauffer") was employed by the City as Director of Public Utilities. In May 2009, Jacqueline Wesley ("Wesley") was an associate employed by CDM. In May 2009, Justin Haydel ("Haydel") was employed by CDM and served as a vice-president of CDM.

---

[1]The background section is drawn from the City's Statement of Material Facts as to Which There Exists No Genuine Issue to be Tried (Record Document 75-1) and CDM's Statement of Contested Material Facts (Record Document 90-1). Many of the City's facts went uncontested. Citations to the record will be included for all contested facts.

On March 14, 2008, the City and CDM entered into the Wastewater Agreement, which was executed by Mayor Lorenz Walker ("Mayor Walker") on behalf of the City and Haydel on behalf of CDM. See Record Document 75, Exh. 12 (Bates # CAMP 81634 - CAMP 81655). In pertinent part, Exhibit A to the Wastewater Agreement reads as follows:

> EXHIBIT A
> TO AGREEMENT BETWEEN
> OWNER AND ENGINEER
> (STUDY AND REPORT)
>
> . . .
>
> CITY OF BOSSIER CITY
> WASTEWATER SYSTEM
> MASTER PLAN
> SCOPE OF SERVICES
> January 2, 2008
>
> . . .
>
> 1. 201 Wastewater Facility Plan
>    a. Prepare a 201 Wastewater Facility Plan and Environmental Information Document to entitle Bossier City to low interest financing (2.95%) through the Louisiana Department of Environmental Quality State Revolving Fund (SRF) program
>       I. The Project consists of the update of the Wastewater Facility Plan and accompanying Environmental Information Document (EID) which will describe a staged program for the resolution of wastewater treatment and defined collection system problems including compliance with current and future regulations, and projected demand requirements. The Wastewater Facility Plan will be prepared to serve as a 20-year guide to the City of Bossier City for establishing a funding vehicle for implementation and will meet all requirements set out by LDEQ for the State Revolving Fund (SRF) program.
>
> 2. Evaluation of Existing Lift [S]tations.
>    a. Conduct a detailed field inspection and evaluation of all pump and lift stations to determine corrections and improvements required to

        provide reliable pumping capacity and/or potential elimination of pump stations to save the City money. Document in reports, recommendations for each pump stations. Work may consist of modeling operations of larger lift stations where needed.

3. Sanitary Sewer System Evaluation Study
    a. Perform preliminary sanitary sewer evaluation survey (SSES) that covers public sewers. Field work will include flow monitoring (approximately 30 monitors and rain gauges for 60-days), limited smoke testing, manhole inspections (up to 600 manholes), detailed surveying to update City sewer maps and manhole inspections. The preliminary SSES will focus on the main trunk sewers and data gathered will be used to define sub-basins and assign priorities to sub-basins for rehabilitation efforts. Include recommendations and guidelines that will enable the City of Bossier City to prioritize the sewer repair, inflow correction, and sewer rehabilitation work required to address the defects and deficiencies found in the collection system through the conduct of the preliminary SSES. Include recommendations that will guide the City in follow-on actions to address private laterals including notifications of private property owners, codes and ordinance provisions required, inspection and testing. Survey work (when needed) will include obtaining all information related to geographical position of manholes, elevation of tops of manholes, invert elevations, type and size of pipes in/out of manholes. GIS surveying will be used, which will enable the City to enter the new data into their GIS system.

4. Collection System Hydraulic Model
    a. Prepare hydraulic model that utilizes the City's existing GIS as well as information obtained from the preliminary SSES and Lift Station Evaluation.
    b. Conduct additional flow and rainfall monitoring and other field-work and survey as required for proper calibration of the updated hydraulic model.
    c. Run model to identify suspected locations of overflow from the collection system. Perform field investigations and conduct interviews to verify and/or refine the locations identified by the model.
    d. Prepare a report summarizing the model development and calibration. This report will also include maps showing the locations of model-predicted overflows.

> 5. Capacity Management and Operations & Maintenance (CMOM) Program

Id., Exh. 12 (Bates # 81644, 81645-81646).

On June 23, 2009, the City and CDM entered into Amendment No. 1 To Agreement Between Owner And Engineer ("Amendment No. 1"), which was also executed by Mayor Walker and Haydel. See id., Exh. 14 (Bates # CAMP 00324 - CAMP 00329). The provisions of the Wastewater Agreement are applicable to Amendment No. 1. The Wastewater Agreement provided:

> This Agreement (consisting of Pages 1 to 10 inclusive), and the Exhibits identified above constitute the entire agreement between OWNER and ENGINEER and supercede all prior written or oral understandings. This Agreement may only be amended, supplemented, modified, or canceled by a duly executed written instrument.

Id., Exh. 12 (Bates # CAMP 81642). Amendment No. 1 amends the Wastewater Agreement.

In September 2009, CDM submitted the 201 Wastewater Facility Plan[2] to the City, as required by the Wastewater Agreement. See Record Document 75, Exh. 124. As stated in Exhibit A to the Wastewater Agreement, the 201 Wastewater Facility Plan was to "describe a stated program for resolution of wastewater treatment and defined collection system problems" and was "to serve as a 20-year guide to the City." See id., Exh. 12 (Bates # 81645).

The City contends that CDM breached multiple items of performance under the Wastewater Agreement:

---

[2]The 201 Wastewater Facility Plan is also referred to as the "201 Facility Plan" and the "Wastewater Master Plan."

- The 201 Facility Plan did not make recommendations for corrections and improvements required to provide reliable pumping capacity and/or potential elimination of pump stations to save the City money.

- CDM did not perform any smoke testing on the City's wastewater collection system.

- The City never received a supplement to the 201 Facility Plan in which CDM assigned priorities to sub-basins for the City's rehabilitation efforts.

- The City never received a supplement to the 201 Facility Plan in which CDM provided to the City recommendations and guidelines that will enable the City to prioritize the sewer repair, inflow correction, and sewer rehabilitation work required to address the defects and deficiencies found in the collection system through the conduct of the preliminary SSES.

- The City never received a supplement to the 201 Facility Plan in which CDM provided recommendations that would guide the City in follow-on actions to address private laterals including notifications of private property owners, codes and ordinance provisions required, inspection and testing.

- CDM never delivered to the City the electronic GIS survey information required by the Wastewater Agreement.

- CDM never delivered to the City a final copy of a Capacity Management and Operation & Maintenance (CMOM) Program.

Record Document 75-1 at ¶¶ 16, 18-22.  The City also avers that it never received a copy of Section 7 of Appendix A to the September 2009 plan, whether as part of the original plan delivered or as a supplement or addendum.  See Record Document 75-1 at ¶ 17.  Conversely, CDM contests this fact, stating that there is "correspondence showing that Section 7 was delivered to Justin Haydel."  See Record Document 90-1 at ¶ 17; see also Exh. 179.  CDM asserts that "by all indications, [the City] received Section 7 prior to CDM's unlawful termination from the projects."  Record Document 90-1 at ¶ 17.

The City alleges that as a result of the aforementioned breaches of performance, the Wastewater Master Plan delivered by CDM was never utilized. See Record Document 75-1 at ¶ 23. CDM contests this fact, arguing that the plans, specifications, analysis, data, recommendations, and demonstratives prepared by CDM were certainly utilized by the City. See Record Document 90-1 at ¶ 23. More specifically, CDM maintains that the City has indicated during this litigation that other documents and deliverables prepared prior to CDM's unlawful termination from the projects are still being utilized by Bossier and Manchac Consulting Group, CDM's replacement on the Water Treatment and Wastewater Contracts. See id.

From July 2008 to August 2009, the City was billed and paid CDM $1,006,000 for its work to develop the Wastewater Master Plan. See Record Document 75-1 at ¶¶ 24-33. CDM submitted additional invoices for $54,000 on September 23, 2009; for $30,000 on December 2, 2009; and for $10,000 on September 24, 2010. See id. at ¶¶ 34-36. These invoices were not paid by the City. See id.

In June 2010, the City declared CDM to be in breach and default of the Wastewater Agreement, as amended. See Record Document 31, ¶ 43. The City gave CDM thirty (30) days written notice of termination of the Wastewater Agreement, as amended. See id.

## LAW AND ANALYSIS

I.  **Partial Summary Judgment Standard.**

Rule 56(a) provides, in pertinent part:

Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine

> dispute as to any material fact and the movant is entitled to judgment as a matter of law.

F.R.C.P. 56(a) (emphasis added); see also Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir.2010).[3]  "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Quality Infusion Care, Inc., 628 F.3d at 728.  "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir.2004).

If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."  Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir.2004).  Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted.  See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir.2005).

"A partial summary judgment order is not a final judgment but is merely a pre-trial adjudication that certain issues are established for trial of the case."  Streber v. Hunter, 221 F.3d 701, 737 (5th Cir.2000).  Partial summary judgment serves the purpose of rooting out, narrowing, and focusing the issues for trial.  See Calpetco 1981 v. Marshall Exploration, Inc., 989 F.2d 1408, 1415 (5th Cir.1993).

---

[3]The Court notes that amended Rule 56 requires that there be "no genuine dispute as to any material fact," but this change does not alter the Court's analysis.  F.R.C.P. 56(a) and Advisory Committee Notes.

II.   **Interpretation of Contracts.**[4]

Under Louisiana law, the "[i]nterpretation of a contract is the determination of the common intent of the parties." La. C.C. Art. 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. C.C. Art. 2046. "When a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law." Wooley v. Lucksinger, 61 So.3d 507, 558 (La. 2011). "A contract is ambiguous only if its terms are unclear or susceptible to more than one interpretation, or the intent of the parties cannot be ascertained from the language employed." Gebreyesus v. F.C. Schaffer & Assocs., Inc., 204 F.3d 639, 643 (5th Cir.2000).

III.   **Analysis.**

The City has moved for partial summary judgment on the ground that CDM breached its contractual obligations under the Wastewater Agreement. For the reasons set forth below, the Court finds that partial summary judgment as to the City's claims against CDM for breach of the Wastewater Agreement is not appropriate.

The City first argues that CDM breached its duties with respect to inspection and evaluation of pump and lift stations. The City contends that CDM did not conduct detailed field inspections, did not conduct detailed evaluations, and did not provide

---

[4]This diversity case is governed by Louisiana substantive law. See Erie R. Co. v. Tompkins, 304 U.S. 64, 585 S.Ct. 817; Holt v. State Farm Fire & Cas. Co., 627 F.3d 188, 191 (5th Cir.2010).

recommendations. See Record Document 75-2 at 8-13. The key contractual provision on this issue is set forth below:

> Conduct a detailed field inspection and evaluation of all pump and lift stations to determine corrections and improvements required to provide reliable pumping capacity and/or potential elimination of pump stations to save the City money. Document in reports, recommendations for each pump stations. Work may consist of modeling operations of larger lift stations where needed.

Record Document 75, Exh. 12 (Bates # 81645).

CDM argues that the aforementioned contractual provision is ambiguous and unclear in a variety of ways. More specifically, CDM maintains that it is unclear if the word "detailed" is intended to modify "evaluation" in addition to "inspection." CDM also points to "the fragment 'Document in reports, recommendations for each pump station'" as ambiguous. Finally, in light of the City's criticism of CDM's recommendations as cursory at best, CDM maintains that "recommendations" is neither defined nor qualified with an exhaustive requirement.

Appendix F of the 201 Facility Plan, also known as the Wastewater Master Plan, is part of the summary judgment record. Appendix F contains specific evidence of CDM's inspection and evaluation of pump and lift stations as well as recommendations related to those stations. See Record Document 90, Exh. 124 (Bates # CBC 1765-1910). Section 1.1 of Appendix F references "stations identified as 'priority stations' by the City and CDM." Id., Exh. 124 (Bates # CBC 1765). While Table 1-1 of Appendix F reflects that eight lift stations were not inspected, Wesley's affidavit[5] explained the reasons the stations were not

---

[5] Wesley has been employed with CDM since 1990. See Record Document 90, Exhs. 170 & 178. She was the project manager involved in the project related to the Wastewater Agreement. See id.

inspected and further explained that "at least with regard to the two out-of-service stations, the direction not to site-inspect them came directly from the City." Record Document 90, Exh. 178.[6] As to recommendations and the alleged failure of CDM to deliver Section 7 of Appendix A, this Court finds the testimony of Haydel to be essential on this issue. The Court has previously held that much, if not all, of Haydel's testimony is more properly evaluated by the trier of fact at trial due to credibility issues.

Considering all of the foregoing together, this Court finds that CDM has met its burden of showing a genuine dispute of material fact as to the City's first argument that CDM breached its duties with respect to inspection and evaluation of pump and lift stations. Moreover, the Court finds that the contractual provision at issue is reasonably susceptible to a number of interpretations. While it true that the contract must be construed against its drafter, CDM, this Court believes genuine disputes of material fact exist as to the intent of the parties.

The reasoning set forth above applies to the City's remaining arguments in support of its Motion for Partial Summary Judgment. The City argues that CDM breached its contractual obligations with respect to the Sanitary Sewer System Evaluation Study ("SSES"), the Capacity Management and Operation & Maintenance Program ("CMOM"), and the 201 Wastewater Facility Plan. See Record Document 75-2 at 13-21. For example,

---

[6]In her affidavit, Wesley attested:

> During [my] time working on projects related tot he Wastewater Agreement in 2008 and 2009, directives on modifications were given without formal amendment, and notices to proceed and other directives were given informally.

Record Document 90, Exh. 178.

as to the SSES, CDM argues that the scope of services was ambiguous as to the meaning of "limited smoke testing." Record Document 90, Exh. 12 (Bates # 81645). Additionally, CDM has submitted Wesley's affidavit, wherein she explained:

> 3. . . . In order to provide accurate data, CDM proposed that further flow monitoring be done. CDM also proposed that the number of "manhole inspections" be decreased and "limited smoke testing" be eliminated in order to prevent any change in cost to the City.
>
> 4. Justin Haydel assured [Wesley], in or around November 2008, either verbally or by email, that he would discuss with the City . . . the proposition of modifying the Scope of Services of the Wastewater Agreement, decreasing the number of "manhole inspections" and eliminating the "limited smoke testing" in order to perform one month of additional "flow monitoring" at no additional cost to the City . . . . Thereafter, she and her team proceeded with the field work on the understanding that the number of "manhole inspections" had been decreased and the "limited smoke testing" had been eliminated from the scope of the field work. After November 2008 and through the end of CDM's work on the Wastewater project, she was never told by Justin Haydel, Brian Kauffer, or any other representative of the City . . . that this change in the field work was improper, mistaken, or problematic.

Id., Exh. 178.

In a previous ruling, this Court held that "CDM has met its burden of demonstrating the existence of a genuine dispute of material fact regarding whether the cost and design criteria of the written contracts at issue in this case were modified orally and/or by the conduct of the parties. The communications between Haydel and Kauffer are crucial evidence in this case." The same reasoning holds true as to the instant motion, as CDM has met its burden of demonstrating the existence of a genuine dispute of material fact regarding whether the scope of services set forth in Exhibit A to the Wastewater Agreement was modified orally and/or by the conduct of the parties. Moreover, the Court finds that CDM has demonstrated that many of the contractual provisions are ambiguous and

genuine disputes of material fact exist as to the intent of the parties. For these reasons, the City's Motion for Partial Summary Judgment as to CDM's alleged breach of its contractual obligations under the Wastewater Agreement must be denied.

## CONCLUSION

The Court finds genuine disputes of material fact exist as to whether the scope of services set forth in Exhibit A to the Wastewater Agreement was modified orally and/or by the conduct of the parties. The Court further believes that many of the contractual provisions at issue are reasonably susceptible to a number of interpretations. Thus, genuine disputes of material fact exist as to the intent of the parties and/or whether CDM's performance satisfied the terms of the contract.

Accordingly,

**IT IS ORDERED** that the Motion for Partial Summary Judgment (Record Document 75) filed by the City be and is hereby **DENIED**.

**THUS DONE AND SIGNED**, Shreveport, Louisiana, this 16th day of September, 2014.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE